RECEIVED
CLERK'S OFFICE

2015 MAR 23  AM 9: 44

U.S. DISTRICT COURT
MIDDLE DIST. OF GEORGIA
MACON, GEORGIA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

|  |  |
|---|---|
| | : |
| UNITED STATES OF AMERICA *ex rel.* CARDELLIA ANDERSON, | : **FILED UNDER SEAL PURSUANT TO** |
| | : **31 U.S.C. § 3730** |
| Plaintiff and Relator, | : |
| | : **Civil Action No.:** 4:15- CV-42 |
| v. | : **\*SEALED\*** |
| UNITED TECHNOLOGIES CORPORATION, and | : |
| PRATT & WHITNEY, | : **FALSE CLAIMS ACT COMPLAINT JURY TRIAL DEMAND** |
| Defendants. | |

## I.    INTRODUCTION

1.

Relator Cardellia Anderson (the "Relator") brings this *qui tam* action on behalf of United States of America ("United States") pursuant to the provisions of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"), against United Technologies Corporation ("UTC"), and its business, Pratt & Whitney ("Pratt & Whitney"), collectively "Defendants."

KH333921.DOC

2.

The violations alleged arise out of the presentation of claims for payment made, directly or indirectly, to the United States Government or a member of the Armed Forces of the United States (together, "USG") by the Defendants, or by others acting on its behalf, for contract services.   The claims were false and fraudulent because of:  (1) Improper Billing and Cross-Charging on Contracts; (2) Swapping; (3) Sale of Damaged Goods; (4) Serviceable Military Assets ("SMA"); and (5) Violations of the Truth-in-Negotiations Act ("TINA").   Moreover, the charges for the services provided were excessive, substantially exceeding the level of legitimate charge that could properly be imposed for the services provided under governing federal procurement regulations, including but not limited to, the Federal Acquisition Regulation ("FAR"), 48 CFR *passim*.   Further, the services were provided in violation of governing federal procurement regulations, including but not limited to the FAR; the charges included accessorial and other charges that were unnecessary and valueless and were included simply as a way improperly to "justify" the level of the charges imposed; the charges included fees for services that were either not rendered, not rendered in full or not rendered as required by contract, or by governing federal regulations.

3.

Unless otherwise stated, the allegations in this Complaint, regardless of verb tense, refer to the period from about 1996 (upon information and belief) to the date of the filing of this Complaint ("relevant period").

4.

Relator's claims, as stated in this Complaint, to the best of Relator's knowledge, are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding to which the United States is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

5.

Relator is the "original source," as that term is used in the FCA [and other laws at issue herein], of the information upon which this Complaint is based. Relator brings this action based on his direct knowledge and, where indicated, on information and belief.   None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4).

6.

As required by the FCA, 31 U.S.C. § 3730(b)(2), simultaneously with the filing of this Complaint, is provided to the Government a statement of all material evidence and information related to the Complaint.   This disclosure statement

supports the existence of submission of knowingly false claims for payment and approval, and the knowing making, using, and causing to be made and used, false records or statements material to a false claim by Defendants, under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (B), and (C). Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

## II.    FEDERAL JURISDICTION AND VENUE

### 7.

This Court has original federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the federal False Claims Act, and 31 U.S.C. § 3732.

### 8.

This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, resides in, or transacts business in this District. Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 were performed by it in this District. 31 U.S.C. § 3732(a).

9.

Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

### III.   PROCEDURAL ALLEGATIONS

10.

To the extent, if any, that this case is deemed to be a "related action" and to the extent, if any, that facts set forth herein are deemed to be the same as facts underlying an existing qui tam FCA action pending at the time of the filing of this action, as set forth in 31 U.S.C. § 3730(e), said factual allegations in common with any pending action that would cause this case to be a "related action" are hereby expressly excluded from this action, but only to the limited extent necessary to avoid the statutory preemption.

11.

Furthermore, to the extent that the allegations or transactions set forth herein are the subject of civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein, which are the subject of any such civil suit or administrative civil penalty proceedings are expressly excluded, but

KH333921.DOC                                5

only for the specific time periods, specific companies, and/or specific allegations or transactions that are already the subject of the civil suit and/or administrative civil money penalty proceeding.

## IV. **PARTIES**

### 12.

Relator, CARDELLIA ANDERSON, is a citizen of the United States and a resident of the State of Georgia. At times relevant and material to this Complaint, Relator has been employed by the Defendants. Relator began employment with Defendants in or about May 2014 and has been continuously employed by Defendants since that time. Throughout the entire period of employment with Pratt & Whitney, Relator has had an office at its Midland, Georgia location, that is, Columbus Engine Center; 5898 Osceola Court, Midland, Georgia 31820.

### 13.

From in or about May 2014 to present, Relator has served as a Master Production Scheduler. In this position, Relator reports to F100 Operations Manager, Michael Goos, who became the Operations Manager in or about January 2014. By virtue of this position, Relator has insight into Defendants' Engine Induction Booking System (EIBS) as well as Defendants' Systems, Applications & Productions (SAP) business application software solutions database. This insight

provides Defendants' labor, billing, invoicing, forecasting, planning as well as technical data, etc. Relator has knowledge of the information in this Complaint based on her personal knowledge, as well as from independent investigation conducted by Relator, which includes information received by Relator from current employees regarding the fraud Defendants have committed and continue to commit.

14.

Defendant Pratt & Whitney is a corporation organized under the laws of the state of Delaware and has its primary business office at 400 Main Street East Hartford, CT 06108. The Registered Agent is CT Corporation System, 1201 Peachtree Street, NE, Atlanta, GA 30361. According to its website, Pratt & Whitney is a global leader in aircraft propulsion is behind many of the major advances in both military and commercial engines. Pratt & Whitney designs, manufactures and services aircraft engines, auxiliary and ground power units, and small turbojet propulsion products.

15.

Defendant, United Technologies Corporation ("UTC"), serves customers in the commercial aerospace, defense, and building industries. According to its website, UTC is comprised of the following businesses: Pratt & Whitney,

Sikorsky, UTC Aerospace Systems, UTC Climate, Controls & Security, and UTC Building & Industrial Systems.  UTC is a corporation organized under the laws of the state of Delaware and has its primary business office at One Financial Plaza Hartford, CT 06103.  According to the Georgia Secretary of State website, UTC's Registered Agent is CT Corporation System, 1201 Peachtree Street, NE, Atlanta, GA 30361.

16.

In approximately 1983, Pratt & Whitney opened its plant in Columbus, Georgia.  In approximately 2013, Pratt & Whitney opened a new F-100 engine overhaul facility in Columbus, Ga.  The 105,000-square-foot facility enhanced Pratt & Whitney's capacity to service engines that power F-16 and F-15 fighter aircraft used by the U.S. Air Force and international military customers.  See http://www.pw.utc.com/Press/Story/20131212-

0830/2013/All%20Categories#sthash.s2sOMsQf.dpuf

17.

Pratt & Whitney's Columbus Engine Center  is a full-capacity, world-class jet engine maintenance facility serving commercial customers as well as the United States government.  According to its website, the facility is an IAE V2500 engine maintenance center of excellence and North America's leading provider of

V2500 engine overhauls. The facility also provides PW2000 engine overhaul as well as F117 engine overhaul services for the U.S. military's C-17 Globemaster III cargo aircraft. See http://www.pw.utc.com/Press/Story/20131212-0830/2013/All%20Categories#sthash.s2sOMsQf.dpuf

18.

The Columbus Engine Center offers a variety of services including heavy maintenance, hot section refurbishment, module repair, inspection, performance enhancements and engine testing. See http://www.pw.utc.com/Press/Story/20131212-0830/2013/All%20Categories#sthash.s2sOMsQf.dpuf

**V.**    <u>**GENERAL ALLEGATIONS**</u>

19.

Relator has knowledge of five (5) different fraud schemes that have been perpetrated by Defendants. These schemes include: (1) Improper Billing and Cross-Charging on Contracts; (2) Swapping; (3) Sale of Damaged Goods; (4) Serviceable Military Assets ("SMA"); and (5) Violations of the Truth-in-Negotiations Act ("TINA"). Each scheme is addressed in turn below.

20.

## Scheme 1 - Improper Billing and Cross-Charging on Contracts

Defendants' SAP system for Labor Tracking and Reporting for the F100 Program is used for an employee to track and for finance/management to bill labor against the relevant contracts. However, the Defendants' SAP system is not functioning properly; therefore, the hourly employees have no way of validating the number of hours that is being billed/submitted. Instead, the respective supervisors/managers are manually entering/charging hours for work performed each day and the employees are not asked to validate the authenticity of the hours worked.

21.

Upon information and belief, supervisors and managers are inflating the number of hours the mechanics and inspectors are working and over billing/mischarging the contract. Specifically, the supervisors/managers are inflating and billing the USG a higher amount of hours than the number of hours needed to complete an individual job[1] as part of either the Basic or Over and

---

[1]    A job is the disassembly or the assembly of an engine module. Typically, the labor is charged in the sales order, and thus tied to the specific sales order number.

Above work[2] that is given an identifying number.  In addition, the USG is also being billed for that employees are standing around as well as for time when the machines are down during work stoppage and there is no work.  Finally, some employees who do not have Inspector stamps (Susie Henderson and Juan Hernandez) and who are training are working, and billing, overtime hours in violation of federal regulations.

22.

Under normal circumstances when beginning a job, a mechanic should swipe his/her unique badge at a scanner which identifies on the system the job that he or she will be doing, a process known as "badging in."  However, the F100 Program's SAP system is not working properly and does not identify if the mechanic is assembling the module or disassembling the module.  Often, the Badge Scanner/SAP does not pick up the scan at all and the manager/supervisor simply manually enters time for the hourly employee whether the employee actually worked the hours or not.

---

[2]     Over and above jobs are jobs that are already complete and the mechanic is going back to double-check the work, which leads to more labor charges.  If it is basic work, there is generally no need to continue to double-check it.

23.

At the conclusion of the work on that job that day, the mechanic either "badges out" of that job, i.e. swipes his or her unique badge and indicates that the job or his/her work on the job is complete, or s/he badges in to another job, which automatically stops the clock running on the first job and starts a clock running on the job. On some days the scanner does not function at all and on some days it only functions intermittently; thus, there is no reliable indication of when one job ended and another job began.

24.

Some mechanics who complete their work on Over and Above jobs in less than the job's estimated time, begin performing Basic work[3] while still badged into the Over and Above job, until the Over and Above job reaches its estimated time; thus resulting in double-billing of the USG for that labor. In addition, mechanics are performing Basic work after hours, intentionally creating unneeded overtime hours. This practice is well-known by the General Site Manager, currently Tom Bode. In addition, the Shipping Coordinator, Chris Sturges, is working overtime when there are no modules that are actually being shipped out during this time.

---

[3]    Basic work is generally performed by a journeyman, or new, mechanic. Generally, an experienced mechanic should not be performing basic work.

25.

During all hand meetings in 2014 and 2015, Defendants' first-level managers and Site Manager (to include, but not limited to, Mr. Tom Bode, Mr. Mike Goos, Mr. Eric Mike, Mr. Jim Fowle) instructed a number of materials personnel, inspectors, and mechanics that they could remain badged in on Over and Above jobs while performing Basic work during their holidays and vacation time up to five times the estimated hours for the Over and Above work. As a result of the foregoing misbilling, the USG paid Defendants extra money for work that was already included in Defendants' contract payment; thus overbilling the USG.

26.

Upon information and belief, Defendants engage in cross-charging on contracts in the F100 Program by improperly shifting the costs and expenses from commercial work to the defense contract in order to boost profits. Defendants have employees working between the commercial (plant 1) and military (plant 2) programs, thus sharing resources between the two areas, without tracking the labor appropriately between the two. Upon information and belief, all the time is being charged to the military, including time worked on the commercial side. For example, J.P. Stinson, an inspector for the commercial side of the business bills his time on both the military and commercial side to the USG. Others engaging in this

practice include, but are not limited to, Brett Mader (Sale Leader) and Matt Sezimore (Inspector). Upon information and belief, knowledge of this practice includes, but is not limited to, Bradley Hill (Inspector), J.P. Stinson (Inspector), Brett Mader (Sales Leader), Matt St. George (Operations Manager), Tom Bode (Site Manager), Julie Ireland (Program Manager), Jeff Zotti (Program Director), Lori Caruso (Vice President of the F100 Program), Paul Adams (President of Defendant), and Greg Hayes (President of UTC) and the Corporate Board of Directors of UTC. Further, Relator has reported this practice to Jennifer Crowe, Finance, Mike Goos, Operations Manager, Tom Bode, Site General Manager, and Debbie Williams, Materials (Ms. Williams splits her time between commercial and military).

27.

On-condition maintenance (OCM) aircraft maintenance is done when parts are replaced only when their condition appears to no longer be airworthy, instead of at predetermined intervals of operation. Defendants should be undertaking this type of maintenance instead of a Re- OCM of the modules. By continuing to Re-OCM the modules Defendants are creating additional hours and rework which results in the double billing of labor.

28.

## Scheme 2 - Swapping

In the F100 Program, Defendants frequently swap parts/material and do so often without the certificate of conformance and without permission from the USG contracting officer. The relevant contracts specify that Defendants must build engines using a certain grade or quality of parts. Yet, Defendants provide substitute (and often inferior) parts that can be obtained more cheaply from an unauthorized source. Relator has observed this practice firsthand. Specifically, Javier Abbruzzese, Quality/Records Manager, asked the procurement staff in early January 2015 if the staff would request for suppliers to provide a letter to certify and validate that all the parts received were serviceable parts -- essentially papering the parts after the fact. Knowledge of this practice includes Sam Henderson, Quality Manager, Chris Ewing, Materials Manager, Mike Goos, Operations Manager, and Matt St. George (Operations Manager for Commercial). On or about January 2015, Relator attended a meeting with the aforementioned managers and learned that many parts had been installed on modules without the required certificate of conformance.

29.

## Scheme 3 - Sale of Damaged Goods

On or about February 27, 2015, Defendants shipped Indonesia Engine #9 (Sales Order #EA011209-01) with the incorrect Augmentor.  Instead of shipping Augmentor #9 with the Engine, Augmentor #11 (EA00865-01) was assembled and attached to Engine # 9 (Sales Order E713157-01).  In essence, Defendants sold the USG a damaged good knowing that Augmentor #9 was damaged.[4]  Relator raised this issue with the following:  Matt St. George (Operations Manager), Tom Bode (Site Manager), Julie Ireland (Program Manager), Jeff Zotti (Program Director), Lori Caruso (Vice President of the F100 Program), Paul Adams (President of Defendant), Greg Hayes (President of UTC) and the Corporate Board of Directors of UTC.  Relator also reported this conduct to Colonel Jones, Defense Contract Management Agency ("DCMA") and to the Department of Defense, Office of the Inspector General.

---

[4]     Augmentor #9 was damaged in or around January 2015 when a mechanic, Alan Swike, did not torque the bolts properly.  To date, the Augmentor is still being tested and remains at the Columbus Engine Center.

30.

## Scheme 4 - Serviceable Military Assets (SMA)

Defendants have a division named Serviceable Military Assets (SMA).  Mr. Bob Mackie works out of the Columbus Engine Center and guides and directs the warehouse and inventory personnel on how to code inventory/parts in the system. Often material and/or parts are reported as missing, lost, or untraceable.  Upon information and belief, Mr. Mackie is entering the SAP system and transferring material and module parts from the F100 Program into the SMA inventory.  Upon information and belief, SMA is receiving these parts without paying the USG for them.  Then, SMA is selling them back to the USG.

31.

SMA also brings in fleets of unserviceable engines and strips them down (disassembling them) in the overhaul centers.  These parts do not have serviceable tags nor do they have a certificate of conformance once they have been stripped from the unserviceable engines.  These materials should not be co-mingled with

USG property.  Yet, upon information and belief, SMA is selling this parts as "serviceable" back to the USG.[5]

32.

The labor hours that the mechanics and inspectors are spending on disassembling the unserviceable engines is being billed to the USG.  Because SAP is not working, there is no mechanism by which the employees can differentiate their time between work for the SMA and work for the F100 Program.

33.

Defendants often reports parts as lost, damaged or stolen/missing because of mishandling of the materials and lack of enforcement and oversight of standards. Upon information and belief, this requires the ordering of replacement parts which means that the USG is paying for the part that has been lost/stolen/damaged in addition to the replacement part.  For example, Bob Bradley, the former Quality Manager, has knowledge of a local junkyard owner frequently visiting the San Antonio engine center to obtain engine parts.

---

[5]     Upon information and belief, Defendants may be selling the USG scrap material without the permission of the USG. Relator bases this conclusion on the fact that, in July 2014, the Jordanian customer requested to receive their scrap material. Defendants replied that they did not have the information regarding scrap materials readily available and, to date, Relator believes that this information has not been provided.

34.

## Scheme 5 - Violations of the Truth-in-Negotiations Act ("TINA")

To buy highly specialized weapons systems, the USG often must purchase them from the single company that already makes them, known as a "sole-source supplier." Defendants are sole-source suppliers for the F100 engines.

35.

The USG tries to ensure that it pays a fair price since it cannot put out the contract for competitive bids. TINA requires the contractor to truthfully disclose all relevant information about its costs to the USG in sole-source contract negotiations. That way, the USG can make an informed decision about what price is fair to pay for the product.

36.

Upon information and belief, Defendants do not provide the USG with truthful and relevant information so the USG can make informed decisions about the repairs needed on the engines/modules. For example, instead reporting the CBM's,[6] Defendants are reporting the OCM's. Defendants are also performing

---

[6] Condition-based maintenance (CBM), maintenance <u>when need arises</u>. This maintenance is performed after one or more indicators show that equipment is going to fail or that equipment performance is deteriorating. This concept is

duplicate work by virtue of Re-OCM of the modules to try to maximize the level of the repairs for that module, whether needed or not. Therefore, upon information and belief, Defendants are operating in violation of TINA.

## COUNT ONE

## (VIOLATION OF FALSE CLAIMS ACT-- 31 U.S.C. § 3729(a)(l)(A))

37.

Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

---

applicable to mission critical systems that incorporate active redundancy and fault reporting. It is also applicable to non-mission critical systems that lack redundancy and fault reporting.

CBM-based maintenance was introduced to try to maintain the correct equipment at the right time. CBM is based on using real-time data to prioritize and optimize maintenance resources. Observing the state of the system is known as condition monitoring. Such a system will determine the equipment's health, and act only when maintenance is actually necessary. Developments in recent years have allowed extensive instrumentation of equipment, and together with better tools for analyzing condition data, the maintenance personnel of today are more than ever able to decide what is the right time to perform maintenance on some piece of equipment. Ideally condition-based maintenance will allow the maintenance personnel to do only the right things, minimizing spare parts cost, system downtime and time spent on maintenance.

On-condition maintenance (OCM), is maintenance done when parts are replaced only when their condition appears to no longer be airworthy, instead of at predetermined intervals of operation.

38.

The False Claims Act provides that any person who knowingly presents, or causes to be presented to the Government, a false or fraudulent claim for payment or approval, is liable for (a) three times the amount of the damages sustained by the Government, and (b) civil penalties ranging from $5,500 to $11,000 for each claim. 31 U.S.C. § 3729; 28 C.F.R. 85.3(a)(9).

39.

Upon information and belief, Defendants, by and through its officers, agents, and employees, knowingly presented, or caused to be presented to an officer or employee of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(l)(A).

40.

Said claims were false and fraudulent because of (1) Improper Billing and Cross-Charging on Contracts; (2) Swapping; (3) Sale of Damaged Goods; (4) Serviceable Military Assets ("SMA"); and (5) Violations of the Truth-in-Negotiations Act ("TINA"). In addition, the charges for the services provided were (1) excessive, substantially exceeding the level of legitimate charge that could properly be imposed for the services provided under governing federal procurement regulations; (2) secured in violation of governing federal procurement

regulations; (3) included accessorial and other charges that were unnecessary and valueless and were included simply as a way improperly to "justify" the level of the charges imposed; and (4) the charges included fees for services that were either not rendered, not rendered in full or not rendered as required by contract, or by governing federal regulations, all in violation of 31 U.S.C. § 3729(a)(1)(A).

41.

Said false and fraudulent claims were presented, as alleged, by Defendants with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance as to whether they were false.

42.

In paying these claims, the United States relied on these false and fraudulent claims, were ignorant of the truth regarding these false and fraudulent claims and would not have paid Defendants for these false and fraudulent claims had they known of the falsity of the said claims.

43.

As a direct and proximate result of the false and fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA for each such violation.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained because of the false claims and fraud alleged within this Complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq.,* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented, or caused to be presented, to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the  FCA claims for which redress is sought in this Complaint;

(e)     That the Relator be awarded the maximum amount allowed to him/her pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT TWO

## (VIOLATION OF FALSE CLAIMS ACT-- 31 U.S.C. § 3729(a)(l)(B))

44.

Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

45.

Upon information and belief, Defendants, by and through its officers, agents, and employees, knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to have these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(l)(B).

46.

Defendants knowingly used false records or false statements that were material, and on information and belief continue to be material, to the false and fraudulent claims for payments they made to the United States.

47.

Defendants' materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment that explicitly and/or impliedly attested that they had rendered day services to their

clients consistent with the government rules and regulations when, in fact, the services for which claims were submitted (a) were awarded in violation of governing federal regulations, including the Federal Acquisition Regulation or (b) were either not rendered or not rendered in full or not rendered as required by contract and governing federal regulations.

48.

These said false records or false statements were made, used or caused to be made or used, with Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

49.

As a direct and proximate result of the false and fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA for each such violation.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained because of the false claims and fraud alleged within this complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq.*, provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this Complaint;

(e)     That the Relator be awarded the maximum amount allowed to him/her pursuant the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT THREE

## (VIOLATION OF FALSE CLAIMS ACT -- CONSPIRACY TO SUBMIT FALSE CLAIMS, 31 U.S.C. § 3729(a)(l)(C))

50.

Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

51.

Upon information and belief, Defendants conspired and agreed with each other and with others to defraud the United States, as alleged in Count One and Count Two above.

KH333921.DOC                                   26

52.

As a direct and proximate result of the false and fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA for each such violation.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants, as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained because of the false claims and fraud alleged within this Complaint, as the FCA, 31 U.S.C. §§ 3729, *et seq.,* provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented to the United States;

(c)    That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)    That the Court grant permanent injunctive relief to prevent any recurrence of the FCA for which redress is sought in this Complaint;

(e)    That the Relator be awarded the maximum amount allowed to him/her pursuant this FCA claim; and

KH333921.DOC                    27

(f)     That the Court award such other and further relief as it deems proper.

## JURY TRIAL DEMAND

Relator demands a trial by jury of all claims asserted in this Complaint.

Respectfully submitted this 23rd day of March, 2015.

/s/ Zahra S. Karinshak
Zahra S. Karinshak
Karinshak@khlawfirm.com
Georgia Bar No. 407911

KREVOLIN & HORST, LLC                    *Attorneys for Relator*
1201 W. Peachtree Street, N.W.
Suite 3250, One Atlantic Center
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

KH333921.DOC                    28